**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-276-ACR** |
| **ADRIAN SCHMIDT,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Adrian Schmidt to fourteen months' incarceration, the top of the applicable 8-to-14-month guidelines range, three years' supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.   INTRODUCTION

The defendant, Adrian Schmidt, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Schmidt was one of the first rioters to breach the outer perimeter of the restricted Capitol grounds at Peace Circle.   After he and the mob pushed down the first set of barricades, Schmidt stood on a wall of the Capitol and yelled to other rioters, "Who's House? And "Our House!" Schmidt then jumped over black metal fencing and moved to the front of the mob to confront police officers.   Between 1 p.m. and 2:45 p.m., Schmidt physically battled multiple lines of police officers on the West Plaza by pushing against them with his back as he was pepper sprayed and hit with riot control devices.   After Schmidt pleaded guilty, the government discovered new violent conduct committed by Schmidt.   While on the West Plaza, Schmidt picked up a cylindrical object, believed to be a "selfie stick," and he threw it at the line of police officers who were battling with rioters.   It does not appear to have hit any police officers.

After almost two hours of battling the police officers, Schmidt made his way to the Upper West Terrace and entered the Capitol building.   Schmidt traveled through the Rotunda, entered Statuary Hall, and exited the Capitol building through the East Foyer Doors at 2:51 p.m.   He remained outside the East Foyer Doors and reentered the Capitol building through the same doors at approximately 3:15 p.m.   Schmidt remained in the Capitol building this second time for approximately 15 minutes before he was removed by police officers at 3:30 p.m.   Schmidt then remained on Capitol Grounds until the early evening hours of January 6, 2021.

That evening, Schmidt expressed joy and excitement as he recounted his day in a text message, writing, "Hey we had a blast! I got pepper sprayed and shot with rubber bullets also had

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

a flash bang went off right by my ear, never felt closer to death but never had a better time!" Schmidt also posted to Facebook about the terror likely felt by members of Congress, writing, "they heard us today.   They felt us in their bones with every step they took as they fled the building that they have gotten way to comfortable in."

On October 18, 2024, pursuant to the plea agreement, the government interviewed Schmidt after his plea and he minimize, denied, and lied about his conduct on January 6, 2021.

The government recommends that the Court sentence Schmidt to fourteen months' incarceration for his conviction of violating 18 U.S.C. § 231(a)(3), Civil Disorder.   A fourteen-month sentence reflects the gravity of Schmidt's conduct, but also acknowledges his acceptance of responsibility by pleading guilty.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 22, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.   Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.

The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Image 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 pm, the first breach of

the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at Peace Circle[2] and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Image 1.   They flooded the area labeled "Lower West Plaza" Area C on Government's Image 1, pushing against the barricade there.



*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and

---

[2] "Peace Circle" refers to a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds, where the Capitol's Peace Monument is located.

the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It

began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.







*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

**C.      Schmidt's Role in the January 6, 2021 Attack on the Capitol**

On December 31, 2020, prior to traveling to D.C., Schmidt wrote on Facebook, "Headed to the Capital [*sic*] in 6 days #savetherepublic (fist and American flag emojis)."   On or before January 6, 2021, Schmidt traveled from Cincinnati, Ohio, to Washington D.C. to attend the "Stop the Steal" rally by the former President.   Schmidt attended the rally, but left before the former President finished speaking and walked with a large crowd towards the Capitol.

*Peace Circle*

On January 6, 2021, at approximately 12:50 p.m., Schmidt moved to the Peace Circle Monument just outside the restricted perimeter of the Capitol Grounds.   As discussed above, at approximately 12:52 pm, the first breach of January 6 occurred, with members of the crowd trampling over and around the first barrier protecting restricted Capitol grounds that day – a set of unmanned bicycle-rack barricades at Peace Circle.   Schmidt was part of this first group that breached and went onto restricted Capitol grounds.   After moving past this this first barrier, the

9

crowd advanced slightly further into Peace Circle and the restricted area to engage with the handful of USCP officers at the second barrier (which was the first set of barricades manned by police officers).

Schmidt then made his way to the front of the crowd assembled at this second set of barricades at Peace Circle.



*Still frame from Exhibit 1 at 3:09: Schmidt (circled in red) yelling at officers at Peace Circle*

At 12:53 p.m., Schmidt and the mob surged forward, pushing down the metal fencing and the officers manning the police line.   This was the first violent breach of the restricted perimeter on January 6, 2021, resulting in officer injuries.



*Still frame from Exhibit 1 at 3:41: Schmidt (circled in red) moving past the overrun police line.*

*The West Plaza*

After breaching the second set of barricades, Schmidt then moved towards the Capitol building and onto the West Plaza.   As the mob poured into the restricted perimeter, Schmidt stood on top of a small wall and yelled towards other rioters, "Who's House?" and "Our House!"



*Still frame from Exhibit 1 at 4:37: Schmidt (circled in red) yelling and pointing to other rioters.*

Shortly thereafter, Schmidt and the mob jumped over black metal fencing and advanced towards another line of police officers on the West Plaza.   Schmidt again moved to the front of the mob against the line of police officers and recorded a video with his cellphone.   In the video (Exhibit 2), Schmidt chants, "Who's House?" and he turns towards a police officer guarding the Capitol and said, "We're right here (pointing at the ground). Who's platform? Our platform."



*Still frame from Exhibit 3 at 1:11: Schmidt (circled in red) chanting, "Honorless, honorless," referring to the police officers defending the Capitol.*

Between 1 p.m. and 2:45 p.m., the mob on the West Plaza became more and more confrontational with police officers.   During this time, Schmidt, again, positioned himself at the front of the mob and confronted officers where he was pepper sprayed and pushed back by officers. Schmidt was not deterred.   Over the course of over 90 minutes, Schmidt engaged with officers repeatedly by pushing against officer's riot shields (Exhibit 4) and against metal fencing (Exhibit 5) manned by officers.



*Still frame from Exhibit 4 at :01: Schmidt (circled in red) pushing with his back against police officer's riot shields*

In October 2024, after Schmidt had pleaded guilty, the government discovered new violent conduct committed by Schmidt on January 6, 2021.[3]   At approximately 2:30 p.m., Schmidt is part of the mob on the West Plaza as police officers are defending the Capitol.   Exhibits 6 and 7 show Schmidt bending down and picking up a cylindrical object[4] and then immediately throwing it at the line of officers battling rioters.   The object does not hit anyone, but Exhibits 6 and 7 do not show the termination point of the object.

---

[3] Case law establishes that, at sentencing, "[r]elevant conduct need only be established by a preponderance of the evidence.   *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015); *see also United States v. Watts*, 519 U.S. 148, 156 (1997) ("The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, [U.S.S.G.] § 6A1.3, comment., and we have held that application of the preponderance standard at sentencing generally satisfies due process."); *United States v. Long*, 328 F.3d 655, 670 (D.C. Cir. 2003) ("This court, for its part, has noted the split among the circuits on this issue but has declined to require more than the preponderance standard at sentencing.").

[4] Although the government cannot specifically identify the item, it appears consistent with that of a "selfie stick" used to hold cellphones. Given the distance Schmidt threw the object, this is also consistent with the weight of a metal cylindrical object like a selfie stick.



*Still frame from Exhibit 6 at :51: Schmidt (circled in red) bending down to pick up the object*[5]



*Still frame from Exhibit 6 at :54: Schmidt (circled in red) cocking his arm back to throw*

---

[5] Still frames from Exhibits 6 and 7 are zoomed in using the video player VLC's Interactive Zoom feature. The top left of the image depicts the full video with a box showing which area is enlarged.



*Still frame from Exhibit 6 at :54: Schmidt (circled in red) after throwing the object (yellow)*



*Zoomed in on the object (circled in yellow) from the still frame above*



*Still frame from Exhibit 6 at :55: the object (circled in yellow) traveling over the police officers*

Schmidt's actions obstructed and impeded officers' ability to secure the Capitol.

*Entry and Reentry into the Capitol Building*

After battling with officers on the West Plaza, Schmidt traveled to the Upper West Terrace and entered the Capitol building through the Upper West Terrace Door with his fist raised in celebration at 2:45 p.m.   The fire alarms rang loudly as Schmidt entered the Capitol.



*Image 5: Schmidt (circled in red) entering the Capitol building with his fist raised.*

Schmidt immediately traveled up a flight of stairs inside the building and entered the Rotunda.   From there, Schmidt moved into Statuary Hall towards the House of Representatives. Schmidt then turned around and exited the Capitol building at 2:51 p.m. through the East Foyer Doors next to the Rotunda.   Schmidt remained outside the East Foyer Doors and reentered the Capitol building at 3:15 p.m.   During this second time in the building, Schmidt remained inside the East Foyer for 15 minutes – until 3:30 p.m. when a line of officers cleared the Rotunda. Despite having been forced out of the Capitol building by police, Schmidt remained on restricted Capitol Grounds until the evening of January 6, 2021.



*Image 6: Schmidt (circled in red) inside the restricted perimeter into the evening hours of January 6, 2021.*

**D.      Schmidt's Post-Riot Communications**

On January 6, 2021, at 7:46 p.m., Schmidt sent a text message, writing, "Hey we had a blast! I got pepper sprayed and shot with rubber bullets also had a flash bang went off right by my ear, never felt closer to death but never had a better time!"   Shortly thereafter, Schmidt also wrote in a text message, "we can't stand for this rigged election!"

Schmidt also posted to Facebook regarding his time at the Capitol and about the terror likely felt by members of Congress:



*Image 7:   Schmidt recounting the effects on lawmakers on January 6, 2021.*

**E.  Schmidt's Post-Plea Interview**

On October 18, 2024, the government conducted an interview of Schmidt pursuant to paragraph two of the plea agreement.[6]   During the interview, Schmidt was asked about his actions on January 6, 2021, including the newly discovered evidence showing Schmidt throwing an object at police officers on the West Plaza.   Schmidt minimized his conduct stating he entered the Capitol to sightsee, that he was given permission to enter the Capitol by police officers,[7] and he denied

---

[6] Schmidt's counsel and an FBI agent were present.   The purpose of the interview was – in part – to identify the specific object thrown by the defendant.

[7] After being shown the CCTV where no police officers were in frame when he entered, Schmidt said the police officers were behind the camera. After being shown the other CCTV angle without police officers nearby, Schmidt then claimed he was told by another rioter they were given permission to enter.

throwing any objects on January 6.   When confronted with video of him throwing an object at

police, Schmidt said he could not tell who the person was in Exhibits 6 and 7 and he maintained

he did not throw any objects.   During the interview Schmidt admitted he wore:   a thin red jacket

underneath a blue top jacket, a black beanie,[8] and a backpack.

  

*Still frames from Exhibit 6 at :51 to :54: Schmidt wearing a thin red jacket (yellow arrow), blue jacket (blue arrow), black beanie (red arrow), and gray backpack (green arrow)*

Later in Exhibit 6, Schmidt can be seen in the same location with the carabiner (metal hook for

rock climbing)[9] affixed to his backpack.

---

[8] Schmidt lost his hat during the course of the early afternoon on the West Plaza.
[9] During the interview, Schmidt stated he stopped in the Shenandoah National Forest on his way to Washington D.C. for January 6, 2021. Schmidt can also be seen with climbing rope in his backpack throughout the day.

 

*Still frame from Exhibit 6 at 1:05:
carabiner (circled in red)*          *SOO at 4: Schmidt in blue jacket, with a backpack,
and carabiner (circled in red)*

Images from Schmidt's cellphone (Image 8), CCTV from the Capitol (Image 5), still frames from open source video (Image 9 and 10; Exhibit 8), and images in the SOO (SOO at 5) show Schmidt in the same clothing depicted in Exhibits 6 and 7: a thin red jacket (yellow arrow), blue jacket (blue arrow), black beanie (red arrow) with an emblem (circled in orange), gray backpack (green arrow) with a carabiner (circled in red) affixed to it.



*Image 8: Image from Schmidt's cellphone*



*Image 5: CCTV of Schmidt's entry to the Capitol*



*Image 9: Schmidt inside the Capitol holding his black beanie*

.



*Image 10: Schmidt on West Plaza*



*Still frame from Exhibit 8 at 1:37: Schmidt on West Plaza approximately 30 seconds after his throw in Exhibit 6[10]*

During his interview, Schmidt admitted what he could not deny and denied what he could not admit.   Schmidt did not appear to take responsibility for his actions, let alone show remorse.

---

[10] This is a different angle and it does not depict Schmidt's throw due the user panning the camera. However, Schmidt can be seen in the same area, wearing the same clothing, at the same timeframe

### III.     THE CHARGES AND PLEA AGREEMENT

On August 16, 2023, a federal grand jury returned an indictment charging Schmidt with five counts, including, 18 U.S.C. § 231(a)(3).   On May 29, 2024, Schmidt pleaded guilty to one count of 18 U.S.C. § 231(a)(3) pursuant to a plea agreement.   ECF Nos. 21 and 22.

### IV.     STATUTORY PENALTIES

Schmidt now faces sentencing on Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to five years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The plea agreement and PSR correctly state the applicable guidelines. The agreed upon Guidelines analysis is:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| | **Total** | **13** |

---

as the throw.   The timing of this video can be matched up with Exhibit 6 due to other rioters that are distinguishable.   For example, at :04 in Exhibit 6 a rioter with a red hat can be seen behind police lines with his hands up celebrating.   The same rioter, doing the same actions, can be seen in Exhibit 8 at :22.

Acceptance of responsibility (U.S.S.G. §3E1.1)                                    <u>-2</u>

**Total Adjusted Offense Level:**                                                **11**

*See* Plea Agreement at ¶ 5(A).

As agreed to by the defendant in the plea agreement, the two-level reduction pursuant to Section 4C1.1 (Adjustment for Certain Zero-Point Offenders) does not apply in this case because the defendant used violence or the credible threat of violence in connection with the instant offense, in contravention of U.S.S.G. § 4C1.1(a)(3). *See* Plea Agreement at ¶ 5(C); Statement of the Offense at ¶¶ 8-11; PSR ¶ 42; *see also United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (defining violence as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm."); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting TNM's definition of violence from Bauer).

In this case, Schmidt was present during the first violent push into the restricted perimeter at Peace Circle. *See* Statement of the Offense at ¶ 8. Schmidt continued onto the West Plaza where he confronted officers for over an hour, battling them as they deployed tear gas and pepper spray against him and the mob. *See id*. at ¶ 11. During this time, Schmidt directly pushed against officers on several occasions. *Id.* Newly discovered conduct shows Schmidt threw an object at police officers who were battling police. Schmidt's conduct was "accompanied by fury, vehemence, or outrage," as shown by the numerous videos of him confronting the police officers and inciting the mob against officers with various threatening chants and yells directed at police, such as "Honorless!" and "We're right here (pointing at the ground). Who's platform? Our platform."

Additionally, Schmidt's Criminal History Category does not reflect his prior conduct.   *See* U.S.S.G. § 4C1.1, n. 2.   Although Schmidt has a Criminal History Category of I, he has mostly avoided the consequences of his previous violent actions and should not benefit from Section 4C1.1.   *See* Plea Agreement at ¶ 5(B).   As agreed to in his plea agreement, Schmidt was adjudicated delinquent three times for Domestic Violence convictions between 2011 and 2016, and once for an Assault in 2014.   *See* Plea Agreement at ¶ 5(B).

The government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants.   Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level.   Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[11]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

---

[11] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10.   The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Schmidt's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Schmidt battled his way into the restricted perimeter, physically battled with police officers on the West Plaza for over an hour, threw an object at police officers which could have hit them causing injury, and entered the Capitol building.

Furthermore, Schmidt's actions after leaving demonstrate a lack of remorse and instead joy at his accomplishments.   In the hours after leaving the Capitol, he recounted having a "blast" and how lawmakers "heard us today.   They felt us in their bones with every step they took as they fled the building that they have gotten way to comfortable in."   Over three years later, when interviewed by the Government, Schmidt did not take responsibility.   He lied about being given permission to enter, before recanting that statement.   He stated he went into the Capitol, twice, because he liked the historical architecture despite the statements he posted immediately after about congressmen and women "felt us in their bones . . . as they fled . . . ."   Schmidt admits only what he has to and is not remorseful for his actions on January 6, 2021.

The nature and circumstances of Schmidt's offenses were of the utmost seriousness, and fully support the government's recommended sentence of fourteen months' incarceration.

### B.  The History and Characteristics of the Defendant

The defendant has a significant and violent criminal history which weighs in favor of a lengthy period of incarceration, including convictions both before and after January 6, 2021:

- In 2011, Schmidt was adjudicated delinquent of Domestic Violence as a juvenile. *See* Plea Agreement at ¶ 5(B).

- In 2012, Schmidt was adjudicated delinquent of Domestic Violence as a juvenile. *See id.*

- In 2014, Schmidt was adjudicated delinquent of Assault as a juvenile.  *See id.*

- In 2015, Schmidt was adjudicated delinquent of Breaking and Entering as a juvenile.  *See id.*

- In 2016, Schmidt was adjudicated delinquent of Domestic Violence as a juvenile. *See id.*

- In 2023, Schmidt was arrested for Aggravated Menacing as an adult and he pleaded guilty to Disorderly Conduct, a misdemeanor.  *See id.*

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life.   They came, instead, after a long series of violent offenses.   The defendant's criminal history demonstrates a propensity towards violence that is concerning.  *See* PSR ¶¶ 44-52.   Schmidt is not a first time offender who may be reformed after experiencing the criminal justice system or probation for the first time.   On the contrary, he has an escalating pattern of criminal activity, and he has been emboldened by being given a second chance in 2011, a third chance in 2012, a fourth chance in 2014, a fifth chance in 2015, a sixth chance in 2016, a seventh chance in 2023, and he now comes before the Court stating this time will be different.   It will not.   Schmidt has not been rehabilitated by his repeated chances to reform.   Time and time again he has shown the justice system who he is by his actions and decisions.

The defendant's history and characteristics, including his history of arrest and conviction for violent assaults and history of violent rhetoric, weigh heavily in favor of a lengthy term of incarceration.

28

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Schmidt's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although the defendant has a criminal history category of I, his history of arrest and conviction shows a clear pattern of violent, assaultive behavior.   *See* Section VI(B) *supra.* Second, the defendant has not expressed remorse and his social media statements after January 6

---

[12] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

were those of a man girding for another battle.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Schmidt's own statements that "we had a blast!" and that he "never felt closer to death but never had a better time!" demonstrate that Schmidt's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of violent assault and rhetoric.

Indeed, when given the opportunity to own his conduct – including post-plea identified acts of violence – he not only declined but appeared to outwardly deny that it was even him depicted in the media.   While minimizing – or rather, denying his role in – conduct, the defendant further explained away his crimes.   From his claim that police let him into the Capitol in the middle of a violent riot to his claim that he was only there to sightsee, such unnecessary and silly prevarications suggest a specific need for deterrence.   Almost *four* years after the crime, he can barely admit that what he did was wrong, at least without ensuring other parties also shoulder the blame. This alone weighs in favor of a serious sentence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added).   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a)

31

factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]   "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[14] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the

---

[13] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[14] A routinely updated table providing additional information on the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

relevant sentencing considerations in this case.    Like Schmidt, other January 6 defendants battled with police on the West Plaza and entered the Capitol.

In *United States v. Ronnie Brian Presley*, 21-cr-0257, Presley pleaded guilty to a single count of Civil Disorder, 18 U.S.C. § 231.   Like Schmidt, Presley shouted to encourage/incite other rioters (Presley shouted, "Fight for this!"); entered the U.S. Capitol building through a doorway on the Upper West Terrace and made his way to the Rotunda; stayed in the Capitol building for a significant period of time (Presley stayed inside for approximately an hour); did not leave the Capitol building until forced out by police; physically confronted police (Presley leaned into an officer's baton as the officer tried to push Presley towards an exit and subsequently grabbed an officer's shield); had a violent criminal history (including a 2019 assault conviction and an earlier domestic violence conviction).   Distinct from Schmidt, Presley had a Criminal History Category of II instead of one; however, Presley was not part of the initial breach at Peace Circle, did not enter the building twice, did not throw an object at police officers, and did not post celebratory messages on social media after the fact.   Judge Moss sentenced the defendant to 12 months of incarceration and 26 months of supervised release. Here, however, Schmidt's conduct is worse. Moreover, while his Criminal History Category is I, as discussed above, his record is not unblemished. Thus, compared to Presley, Schmidt's overall criminal conduct and history warrants a more serious punishment.

In *United States v. Michael Dickinson*, 21-cr-649 (JDB), Dickinson pleaded guilty to a single count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).   Similar to Schmidt, as rioters began battling police lines outside the Capitol, Dickinson threw a metal tumbler at police officers.   However, unlike Schmidt, Dickinson hit the officer in

his face shield and chest.   Like Schmidt, Dickinson later interfered with a line of police officers. While Schmidt physically pushed against police officers, Dickinson threw a bucket of liquid on officers who were battling rioters.   Both Schmidt and Dickinson threw objects and attacked police officers on Capitol Grounds during surges by the rioters.   Distinct from Schmidt, Dickinson did not engage in pushes against law enforcement; did not enter the building twice; did not post celebratory messages on social media after the fact; he did not minimize his conduct in a post-plea interview, and Dickinson had no criminal history.   Judge Bates sentenced the defendant to 20 months of incarceration and 36 months of supervised release based on his conduct on January 6. Here, however, the government cannot specifically identify the object thrown and the object did not hit an officer.   Thus, compared to Dickinson, Schmidt's overall criminal conduct warrants a lower sentence than Dickinson.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[15]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The victims in this case, the officers on the West Plaza, did not suffer bodily injury as a result of Schmidt's assault.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Schmidt must pay $2,000 in restitution, which reflects in part the role Schmidt played in the riot on January 6.[16]   Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023.   *Id.*   (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Schmidt's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VIII.   FINE

The defendant's convictions for a violation of Civil Disorder, 18 U.S.C. § 231(a)(3), subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   The

---

[16] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).   Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.   *See* PSR ¶ 111.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of fourteen months' incarceration, the middle of the guidelines range, three years' supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/Brian Brady*
Brian D. Brady
D.C. Bar Number 1674360
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
BBrady@usa.doj.gov
(202) 834-1916