UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| v. : | CRIMINAL NO. 1-23-cr-276 (ACR) |
| ADRIAN SCHMIDT : | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Adrian Schmidt, through undersigned counsel, submits this sentencing memorandum to aid the Court at sentencing. Following a guilty plea, Mr Schmidt was found guilty of one count of Civil Disorder in violation of 18 U.S.C. 231. Based on the facts and arguments below, Mr Schmidt requests the Court sentence him to six-months of home detention, followed by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We submit that this sentence would most accurately address the concerns of the sentencing statute, 18 U.S.C. §3553.

As is our practice, we are not going to belabor the Court with a recitation of the information contained in the Presentence Report. Rather we will contain our remarks to factors we feel pertinent and relevant to the Court's sentencing calculus outside of that document, focusing on Mr Schmidt's actions and memories of the events of 6 January 2021, and perspective on his position over three years later.

**Prologue to 6th January.**

Adrian Schmidt was a supporter of former President Trump. He'd believed in him back in 2016 and felt as the 2020 election loomed the then president had earned his vote again for another

term in office. The events of the latter part of 2020 took a very strange undertone. In the period leading up to the election, perhaps reading the political tea-leaves, the former president claimed were he to lose the election, this could only happen if election fraud were to take place. This meme was bombarded across right-wing media.

A sad indictment of our times is media outlets have become increasingly polarized and seek not to *inform* their respective audiences, but rather cater to the already-apparent biases of their target demographic. In response, it is natural for the audience, hearing what they want to hear, to become increasingly fervent having their particular suspicions and fears buttressed. No one likes to lose, and reassuring any crowd that *if we lose its because we were cheated* is an incredibly powerful narcotic, and this message struck a resonant chord with the right-wing faithful. As the first Tuesday in November approached, the message of potential voter-fraud aimed at the devoted increased to frenetic levels: The scene was set for discord. Trump constantly stoked the fires claiming there was an organized effort from his adversaries to "steal" the election. This was nuclearized with the message that the conservative vote as a whole was being neutralized. Again, the message resonated. Moreover, in addition to the media, the circles and friends one encounters also has a strengthening factor to personal beliefs or fears. All this combined into a toxic mixture, and on the eve of the election the stage was set; the powder was primed.

3rd November arrived. The country watched with bated breath as America went to the polls. Tuesday evening turned into Wednesday; the nation perched on the edge of its seat as the election leaned towards Biden. The right-wing media went into overdrive. It didn't help that recount after recount left us 4 days without a decision, but by Saturday the result was called. The effect of this four-day delay only served to ramp-up the tensions and fears as the faithful watched what appeared to be Trump's prediction coming to pass. In the wake of the result, an explosion of frenzy erupted with court cases, recounts, protests of cheating screamed from the rooftops. The new meme of

"Stop the Steal" took over the airwaves. But as court case after court case collapsed, as recount after recount confirmed the returns, and as state after state refused to nullify their results, the options for the faithful dwindled. 6th January 2021 was the scheduled date for Congress to exercise its two-hundred-year-old constitutional duty in certifying the votes of the Electoral College, and this date quickly became the new focal point. Trump called for a huge rally for that day, and the MAGA hats responded.

### 6th January, 2022

As the day approached, Adrian Schmidt considered the situation. He had observed the last eight weeks frenzy and outrage from the outlets. He had discussed the events with his close friends, relatives, and contemporaries. As mentioned, over the course of his presidency Adrian had viewed Trump to be a good man and a president worthy of a return to office. He was aware of the upcoming rally and discussed attending with friends and relatives. While the discussion was tinged with sadness as the circle of friends were disappointed with the election loss, they had no real inkling that there was anything to be done with respect to the result. Rather this was viewed as a last opportunity to see and hear the outgoing president. So, literally at the last minute, without giving any thought to a hotel, Adrian and a friend, decided to make the trip.

The pair arrived in the DC area on the morning of the 6th having driven straight in from Ohio. They parked at a Metro station in Virginia, and made their way by Metro downtown. They had no real knowledge of where they were supposed to go, but essentially followed the crowds. It took some time to arrive at the rally, and by the time they arrived the immediate area on the Ellipse itself was full. They found a place on the hill surrounding the Washington monument and watched the proceedings on the nearest jumbotron from across Constitution Avenue. Adrian remembers the tone of the crowd in her immediate area as somewhat split: A feeling of camaraderie with fellow Trump supporters tinged with sadness again at the election loss. Some were crying. In wrapping

up the rally, Trump implored the faithful to go to the Capitol to get their voices heard—to take their country back. Adrian and his friend, along with their immediate crowd began the trek down Pennsylvania Avenue.

As they joined the scene at the Capitol, the crowd had reached critical mass. People were packed together like sardines. Adrian was concerned but he remembers the crowd being fairly peaceful at this point. However, he was in a strange town with the only person he knew right in front of him. The friends discussed a plan in case of getting separated. They realized their phones had no service. They could see what appeared to be a media tower. The plan was, if they were to be separated, the tower would be the rendezvous spot.

At this point, the crowd was beginning to get confrontational with a police line. Members of the crowd started to chant at the police. The crowd started to push on metal barriers that had been erected. The air crackled with tension and aggression. Adrian Schmidt had not come to DC to be involved like this, but as was the case with so many people that day, any sense of reason and consideration was drowned in the maelstrom of the mob. As the crowd pushed forward, overcoming the police line and the barriers, he was swept forward, up the stairs by the scaffolding for the inauguration platform, and onto the west terrace. The was a door open to the building. People appeared to be entering the building in what he remembers to be a somewhat orderly fashion. The were police officers by the door appearing to be letting protesters in. He remembers everything being a blur. One minute they were outside on the terrace, the next he was inside. To his day, he is uncertain how that happened.

Before moving on, Adrian Schmidt would like to be clear about this idea of being carried along. He had not fostered any preconceived intent to enter the Capitol that day. However, the nature of the situation was not one that encouraged thoughtful reflection. Additionally, the actions of the police at that entry point did not seem to be taking any active steps to prevent entry. This

4

claim of the police letting rioters in building that day has been spread by many. On being exposed to significant materials concerning these matters, this has always troubled counsel knowing the efforts of the police on that day, and how these two conflicting versions can coexist in the same universe. In a different January 6 trial, counsel heard the testimony of officers who were stationed at an entry point. The sergeant testified that there was only himself and four other officers. The numbers of protesters streaming in made it physically impossible to prevent entry. He was not going to order his men to do anything that endangered them physically. So, they stood to the side and limited their actions to attempting to verbally encourage peaceful respect for the building. This is borne-out by video footage. Nonetheless, it is clear how the protesters misread lack of police action in certain places and how to some extent there still exists the feeling amongst the Trump faithful that they were let in. The upshot of this for Adrian is despite the events of the day constituting a breach of security, the time and place of his entry was free of the violence seen in other areas. So, as people went into the building, he went along. He recognizes and accepts responsibility for these decisions, but remains of the belief that there was no criminal intent on his part, nor of anyone around him to discern.

Now in the building, Adrian was confused and lost. Everywhere looked the same and when taken in context with the circular nature of the Rotunda it was very easy to get turned-around and lose one's bearings. After wandering around, up and down hallways, he found himself in a hallway where police officers were attempting a stand and preventing any further incursion into the building. This was the point at which Adrian knew this was a situation that he needed to distance himself from. He backed away and having wandered around looking for an exit, found himself by the Columbus doors. He initially left, but needing to find a bathroom attempted a re-entry. Finding this difficult, he left once again.

5

Back at the bottom of the hill on the west side when the crowd had made the initial push on the barriers, Adrian had indeed been separated from his friend. Now, back on the outside, he made his way to the media tower they'd planned as the meeting spot. Sure enough, his friend was there. At this point they decided enough was enough and made their way back to the Metro to get back to the car and the long drive home. As they drove, they became aware of what had transpired at other locations in and around the building, and hearing reports of what had taken place, the gravity of what had transpired set in, and the feeling that things would never be the same again was inescapable.

**The Present Day.**

Adrian Schmidt looks back at the events of 6th January 2021 with regret. He feels regret from several angles. First, he expresses remorse for his actions that day. In going to the Capitol, he had no intent to engage in any of the behavior that rose to the level we all experienced. The environment he found herself in was animated to say the least and he found herself being swept along, both emotionally in the mentality of the mob and physically in the manner in which he found himself in the Capitol building itself. As we have mentioned, that is not to say that he was forced in against his will but rather the frenzy left little time for self-reflection: the self-reflection he now employs. He looks back and understands the gravity of being inside the building; what it meant. It brings home that this went way beyond his initial intent. It is the trigger of why he felt the need to get out as quick as he could. He wishes he'd encountered that epiphany before things got out of hand. He knows that despite a lack of any underlying malevolence, or any preconceived plan to alter the election, or even to *fight like hell*, his actions crossed a line, and he accepts responsibility for this.

Secondly, he feels sadness at the manner that the day is now perceived. He came to DC with the honorable intent of displaying support for the outgoing president and hearing him speak

one last time. Throughout the Capitol building area, events span out of control. The nature of the violence the nation witnessed has cast a pall over anyone who attended that day, and that is something he will take a long time, if ever, to get over. He believes the events of that day will inevitably haunt the ex-president, and that certainly is contradictory to the main reason he travelled to DC. He has been approached on several occasions by media to provide his side of events, but has declined to do so. Quite simply his experiences on that day have left an indelible sour taste in his mouth and he wants to put it in the past and close the door as quickly as possible. He is very frightened or what could happen to him at sentencing but he wishes to make the Court aware that he knows he's here based on his own actions and takes responsibility.

**Sentencing Factors.**

18 U.S.C. §3553 provides:

**(a) Factors To Be Considered in Imposing a Sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>    **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>    **(2)** the need for the sentence imposed—
>>        **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>        **(B)** to afford adequate deterrence to criminal conduct;
>>        **(C)** to protect the public from further crimes of the defendant; and
>>        **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Addressing these factors individually we find the following. Nature and circumstances of the offense with respect to this offense is a highly combustible issue, and we will return to it later. On history and characteristics of the defendant there is not much debate. Adrian Schmidt has some criminal history, but it is relatively minor. His background then displays an individual who, while

7

having some contacts with the criminal justice system, has nothing in his background that would indicate anything particularly troubling. Subsection (2)(A) discusses seriousness of the offense, respect for the law, and just punishment for the offense. We will return to this also when we discuss nature and circumstances of the offense. Subsection (B) contemplates adequate deterrence to criminal conduct. He has been emotionally shaken by these experiences here, and the insight he has acquired has left him with the strongest of convictions that this will be his last. Incarceration is not necessary to make that point. Subsection (C) considers a similar idea as that in (B), in protecting the community from further criminal contact. Here we point out given Mr Schmidt has only one criminal conviction, he is far from being a career offender, and again, given his experiences in the current matter, the public has nothing to fear from Adrian Schmidt in the future. As a final comment on Subsections (B) and (C), the events of 6th January constitute Mr Schmidt's first and only foray into mass political events. He has been scarred by this and has vowed to stay as far away from such happenings as possible. Regarding Subsection (D), quite simply Mr Schmidt has no need of any of the services available to U.S. Probation. Which brings us back to sections (1) and (2)(A).

Returning to the nature and circumstances of the offense we find in these matters this is a not a simple issue to unpack. On the one hand, the specific conduct and decisions Adrian accepts responsibility for, in the universe of criminal conduct, are not the most egregious considered by these courts on a daily basis. However, taken into context with the much larger events of 6th January, the nature and circumstances question becomes much less clear. There is no question the events of that day have left a deep scar on the national psyche. Seditionary behavior has in some cases been charged and convicted. But we ask the Court to take note that Mr Schmidt is one of a small group of people who despite having gone down the regrettable road of entering the Capitol realized it was not the place to linger and got out as quickly as possible. We ask the Court to

8

recognize that even at what appeared to be the point of no return, this was a Rubicon he was determined to back away from. We ask the Court to view his actions against the backdrop of those with more sinister intentions as proof of his original harmless purpose and sentence his accordingly.

Addressing (2)(A), we have already discussed Mr Schmidt's view of the rioters' actions being contrary to the best interests of the country, but he also views those acts as not being true to one of his core values of respect towards law and order. We highlight to the Court that he has never been associated with any organization encouraging civil disobedience, advocated overthrow of the government, displaying extremist right-wing views, or has encouraged in any way violence of the nature apparent on 6th January. In terms of any sense of danger to the community, there is simply non: it does not exist. The Court should have no concerns as to his views on the respect for law either today or for the future.

The final issue §3553 to be discussed is the last part of (2)(A): just punishment for the offense. At its heart, this is the very central issue for this Memorandum as a whole. Mr Schmidt is a law-abiding citizen, who placed himself in the wrong place at the wrong time. He came to DC to attend a political rally, and quickly found himself in the middle of an escalating situation in which speech, free or not, was being dropped as a form of expression by a mob, spinning out of control, where rage was taking over. He has been shattered at the fallout from that day. His life will never be the same again. This, in and of itself, is more than adequate punishment. In no way, shape or form, should the Court be under the impression that a departure sentence would be seen as getting away with anything. For the rest of his life Adrian will forever be associated with the events of that day, and he takes this to heart. Given all discussed above, including the fact of his decision to disengage when he did, we ask the Court to sentence in accordance with our proposal.

**Need to avoid sentencing disparities.**

A word on sentencing disparities. In similar matters, the government has created a sentencing chart for individuals that have been convicted and sentenced in relation to the events of January 6. While it is true that the longest sentence for a defendant whose most serious offense was 18 U.S.C. 1512(c)(2) is 90 months, courts have already sentenced a defendant convicted of § 1512(c)(2) as low as 6 months' home detention; 60 months' probation. *See United States v. Crowl* No. 21-cr-28. The essential problem here is the spectrum to which these defendant's belong is vast and by nature, disparate. In these cases it is entirely appropriate to sentence one participant to over eight years in prison while effectively placing another on probation. We ask the Court not to sentence Mr Schmidt based on the circumstances of others, but to focus on the participants here and sentence accordingly.

**Conclusion**

Taking all the above into account. We ask the Court to provide the following sentence. We submit a 6-month period of home detention, followed by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We believe the community would benefit far more from his service than his incarceration. We believe this sentence to best satisfy the concerns of 18 U.S.C. §3553.

/s/ *Peter A. Cooper*
---
Peter Cooper; 478-082
Counsel for Adrian Schmidt
400 5th Street NW.
Washington DC 20001

| a. Employee's Social Security Number *****2679 | OMB No. 1545-0008 | | |
|---|---|---|---|
| b. Employer's Identification Number (EIN) 31-1575142 | d. Control number | 1 Wages, Tips, and other compensation 204578.64 | 2 Federal Income Tax withheld 34767.40 |
| c. Employer's Name, Address, and ZIP Code DEFENSE FINANCE & ACTG SERV AGENT FOR DHHS 1240 E 9TH ST RM 1907 (ZPH) CLEVELAND    OH 44199 | | 3 Social Security Wages 160200.00 | 4 Social Security Tax withheld 9932.40 |
| | | 5 Medicare Wages and Tips 217463.76 | 6 Medicare Tax withheld 3310.40 |
| | | 7 Social Security tips | 8 Allocated Tips |
| e/f. Employee's Name, Address, and ZIP Code RENEE L COOPER 3807 36TH RD N ARLINGTON    VA 22207-4820 | | 9 | 10 Dependent Care Benefits |
| | | 12 See instructions for box 12 DD   24870.99 D    12885.12 | 14 See instructions for box 14 K    2279.08 V    9011.36 |
| | | 13 ☐ Statutory Employee   ☒ Retirement Plan   ☐ Third-party sick pay | |
| 15 State DC | Employer's State ID Number 300000011199 | 16 State Wages, Tips, etc 204578.64 | 17 State Income Tax 15958.53 | 18 Local wages, tips, etc | 19 Local Income Tax | 20 Locality name |
| 15 State VA | Employer's State ID Number 340727612 | 16 State Wages, Tips, etc 57229.30 | 17 State Income Tax 4152.68 | 18 Local wages, tips, etc | 19 Local Income Tax | 20 Locality name |

Form **W-2** Wage and Tax Statement **2023**

Department of the Treasury - Internal Revenue Service
Copy B To Be Filed With Employee's FEDERAL Tax Return
This information is being furnished to the Internal Revenue Service

| a. Employee's Social Security Number *****2679 | OMB No. 1545-0008 This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | | |
|---|---|---|---|
| b. Employer's Identification Number (EIN) 31-1575142 | d. Control Number | 1 Wages, Tips, other compensation 204578.64 | 2 Federal Income Tax withheld 34767.40 |
| c. Employer's Name, Address, and ZIP Code DEFENSE FINANCE & ACTG SERV AGENT FOR DHHS 1240 E 9TH ST RM 1907 (ZPH) CLEVELAND    OH 44199 | | 3 Social Security Wages 160200.00 | 4 Social Security Tax withheld 9932.40 |
| | | 5 Medicare Wages and Tips 217463.76 | 6 Medicare Tax withheld 3310.40 |
| | | 7 Social Security tips | 8 Allocated Tips |
| e/f. Employee's Name, Address, and ZIP Code RENEE L COOPER 3807 36TH RD N ARLINGTON    VA 22207-4820 | | 9 | 10 Dependent Care Benefits |
| | | 12 See instructions for box 12 DD   24870.99 D    12885.12 | 14 See instructions for box 14 K    2279.08 V    9011.36 |
| | | 13 ☐ Statutory Employee   ☒ Retirement Plan   ☐ Third-party sick pay | |
| 15 State DC | Employer's State ID Number 300000011199 | 16 State Wages, Tips, etc 204578.64 | 17 State Income Tax 15958.53 | 18 Local wages, tips, etc | 19 Local Income Tax | 20 Locality name |
| 15 State VA | Employer's State ID Number 340727612 | 16 State Wages, Tips, etc 57229.30 | 17 State Income Tax 4152.68 | 18 Local wages, tips, etc | 19 Local Income Tax | 20 Locality name |

Form **W-2** Wage and Tax Statement **2023**

Department of the Treasury - Internal Revenue Service
Copy C For EMPLOYEE'S RECORDS (See Notice to Employee on Back of Copy B)




**Government of the District of Columbia**

**2023 D-40B Nonresident Request for Refund**

Important: Print in CAPITAL letters using black ink. Leave lines blank that do not apply.

Personal information